## LAKE CHARLES STEVEDORES, Inc., et al. v. MAYO et al.

### No. 680.

District Court, W. D. Louisiana, Lake Charles Division.

Nov. 26, 1935.

Cline, Thompson & Lawes and Pujo, Bell & Hardin, all of Lake Charles, La., for complainants.

T. Arthur Edwards, of Lake Charles, La., for respondents.

DAWKINS, District Judge.

The complainants are the Lake Charles Stevedores, Inc., a Louisiana corporation, and the National Stevedores Company, a Texas corporation, doing stevedore business at the Port of Lake Charles, La. Defendants are the Local Unions, No. 1214 (white), and No. 1180 (colored), of the International Longshoremen's Association (hereinafter called the International, white or colored as the case may be), and the individual members of said locals.

The complainants seek to enjoin certain acts on the part of the defendants, as fully set out in the bill.

The Port of Lake Charles was officially opened in November, 1926. Charles F. Austin, who had been engaged in the stevedore business at ports in Texas, came to Lake Charles about that time, and in December of the same year there was organized the Lake Charles Stevedores, Inc., one of the plaintiffs, in which Austin became a subscriber to 50 per cent. of its stock. In January following, a charter was issued by the state to a colored organization or union, known as the Louisiana Longshoremen's Association (hereinafter referred to as the Louisiana, colored). This latter organization did not begin to function, nor were its members employed, as such, until towards the end of 1927. In the meantime, the business of the port being in its infancy, the longshore work was done by members of the I. L. A., under the jurisdiction of organizations at the Texas ports. Beginning the latter part of 1927, the said Austin, as the operating head of the Lake Charles Stevedore Company, Inc., employed members of the colored Louisiana and others outside of the I. L. A. to do the longshore work, but was required to use only International members on vessels of the United States Shipping Board. These conditions continued for several years, until some of the members of the International, working at Lake Charles, appealed to officers of that union in Texas. Thereafter, some time in the latter part of 1933, the defendant, W. R. Mayo, was sent to Lake Charles as an organizer for the International.

In May, 1934, an exclusive contract was entered into with the International (white and colored) to do the longshore work at Lake Charles. This was through the instrumentality of the Maritime Association representing employers operating at the Texas ports. The agreement was for one year and expired in June, 1935, but was extended from time to time for periods of fifteen and thirty days, until October 10, 1935, when the locals of the International gave notice it would end on that date; a strike was called, members of the International ceased work and began picketing the property of the port in large numbers, consisting of from 250 to 300 men, who were distributed along the only two roadways or approaches to the wharves. On October 14th following, contracts for one year were entered into with both the white and colored locals of the Louisiana, as distinguished from the International. These contracts were with a maritime association, whose members were composed of businessmen and bankers in the city of Lake Charles, and one of the bones of contention, at least on the part of the defendants, is that it did not represent the real employers of labor, the shipping companies. The Port of Lake Charles had been under the jurisdiction of the maritime associations of Houston and Galveston, Tex., prior to this time, and the complainants contend that, in view of the growth of the port and its business, Lake Charles was entitled to have a separate association to deal with labor.

When the strike was called, there were no substantial questions of wages, hours, conditions of employment, etc., between the parties, but the defendant locals of the International, as well as the International itself, and locals of the Texas ports, were insisting that the Port of New Orleans, and perhaps others, be required to make agreements with the International before the locals at Lake Charles and the Texas ports would sign up with the maritime associations, and there was perhaps still this question of authority of the local maritime association at Lake Charles.

Operations at the Port of Lake Charles having been brought to a standstill by the strike, when the agreement with the Louisiana was made and work started, the presence of such large numbers of pickets created a very threatening condition and appeals were made by the port authorities, first to the sheriff of Calcasieu parish (the docks being outside of the city limits of Lake Charles) and then to the Governor of the state. The sheriff, under recent acts of the Legislature, designed to concentrate authority over local law enforcement agencies in a bureau under the immediate control of the Governor, was without power to increase the number of his deputies (consisting at the time of five) except with the approval of this bureau, dominated by the Governor. The Governor declined to authorize an increase, and the sheriff placed two of his deputies on the scene, one of them having three sons in the picket line. It soon became apparent that, in view of this inadequate official supervision, in the face of the large number of pickets, which of itself had a very strong deterring effect upon any one wishing to work, normal operations could not be resumed, and the port authorities appealed to the Governor to provide protection, either

with state police or units of the National Guard. This he refused to do. Thereupon, the local dock board, possessing authority under the law to employ guards to protect its property, employed a detective agency in the city of New Orleans, to furnish such guards. On the morning of October 21, 1935, some fifty of these arrived in Lake Charles, heavily armed with rifles, shotguns, perhaps a machine gun or two, and "Tommy" or submachine guns. Between 6 and 7 o'clock a. m. of that date, they were transported in trucks to a point a short distance from the docks, where they disembarked and were then marched along the streets past these picket lines with their weapons displayed and thence into and around the dock property. A considerable body of them came out of the southeast corner of the grounds and marched by the picket lines to a small building near the northeast and principal entrance to the docks, where they were stationed. Within a short time thereafter, truck loads of members of the Louisiana were brought into the property to work.

About 5 o'clock of the same day, October 21st, sniping commenced from the marshes from the north or west side of the Calcasieu river, opposite the wharves, some of the shots striking unit No. 5 of the warehouses and in the vicinity of one or more ships which were loading or unloading. The guards returned the fire. across the river, but, all told, the exchange involved comparatively a few shots. Nothing further untoward occurred then until the next day between 12 o'clock noon and 1 p. m. A truck belonging to the dock board came out of the port grounds with either three or four men on it, including the driver. The evidence is conflicting as to whether they had arms. They went to a hardware store in the city of Lake Charles, purchased a cooking stove and other supplies, intended to provide food for the guards. Somewhere between 12:30 and 1 o'clock p. m. the truck returned, and as it left the paved highway on route No. 90 of the state, which turns abruptly at this point to cross a bridge over the river in a northerly direction, leaving the port on its left, a whistle was blown and shooting commenced. The truck had gone about thirty feet on the gravel toward the dock entrance, but the driver quickly turned it in a semicircle to the right around a wire or telephone pole, back upon the paved highway, and proceeded across the bridge in the direction of Sulphur, La., several miles distant. As the truck entered the south end of the bridge, a man standing or sitting on the left side of the truck was shot in the lower right side of the buttocks, the bullet ranging up into the hip joint; another shot entered his left side and went through the intestines. After the truck reached Sulphur, a doctor was called, who rendered first-aid, and shortly thereafter an ambulance brought the wounded man back to the hospital at Lake Charles, where he died. Several hundred shots were exchanged, which started when the truck appeared, one estimate being as high as two thousand. They came from or behind the picket lines in the woods across the highway from the dock property, and also from the docks. Altogether three of the guards were slain and six wounded; one or more of the pickets were slightly wounded, the number or extent of the wounds not having been revealed at the hearing. Firing continued intermittently throughout the afternoon, but by early evening the Governor had been reached and announced he would close the port. By what authority no one has suggested. Members of the dock board then met with officers of the International and a truce was agreed upon. The management of the docks asked the leaders of the union if they would permit and insure safety to the guards and members of the Louisiana workers in coming out of the dock property, but the leaders and officers of the striking unions thought it would be dangerous for any one to attempt to go out in the heavily wooded section to the east and southeast of the port to convey word to those there that a truce had been reached and it was best to wait until daylight before attempting to bring any one out. Most of the workers, and perhaps one of the guards, were carried away to other points on one or more vessels then in the port.

The Governor then announced he would keep the port closed for seventy-two hours. At the end of that time he announced it would be extended for another seventy-two hours, or a total of six days. When the latter period expired, the chief executive then stated he would "wash his hands" of the matter. The port was completely tied up at its busy season when large cargoes, particularly of rice, one of the chief products of that section of the state, with

others, were being moved into the docks for shipping in interstate and foreign commerce.

A few days before the 1st of November, attorneys for the complainants presented to the judge of this court, at Shreveport, La., a bill of complaint and sought a restraining order. At that time the court was busily engaged in the trial of cases at its regular term; the judge had been assigned some weeks previously to sit with the members of the Court of Appeals at Fort Worth, Tex.; and, in view of the fact that the Labor Injunction Act (Norris-LaGuardia Act) § 7, 29 U.S.C.A. § 107 provides that a temporary restraining order shall "become void" at the end of five days, it was not possible for the judge to be in Lake Charles within that delay if the writ were immediately issued. Counsel was advised that, when the writer reached Fort Worth on November 4th, he would endeavor to get excused during the week of November 11th, in order to go to Lake Charles for a hearing. This was done, counsel again presented the bill, and a temporary restraining order was issued, under date of November 7th, returnable at Lake Charles on November 12th.

The evidence in this case tends to show that firearms were held or secreted in the woods near the picket lines prior to October 21st, when the guards and members of the Louisiana entered the dock property; but, in any event, I think it conclusively shown that, after what transpired on the morning of that day, large numbers of such arms were procured by the pickets and members of the International, all with knowledge and acquiescence of the defendants in this case. There probably would not have been any shooting but for the bringing into the port of the heavily armed guards, and a sufficient number of bona fide and impartial deputy sheriffs or other recognized state officers to maintain peace had been sent to the scene by the Governor or other state authorities, upon whom the responsibility for maintaining peace and order rested. The attitude of these officials is rather forcefully illustrated by the fact that one of the two deputy sheriffs supplied had three sons in the picket line. Both the sheriff and the Governor, as well as their adherents, were in the midst of a campaign for the general state election of officers, to be held on the 21st of January, 1936, and there appears little doubt but that this fact accounts for the failure or refusal of these officials to do their duty. In other words, politics was being played at the risk of human life.

The evidence, I think, establishes that there was an understanding between the defendants, officers and members of the International, with other members and unions at other ports, particularly in Texas, that they would not permit commerce to pass through the Port of Lake Charles or the Texas ports until the employers of longshore labor in nonunion ports, particularly New Orleans, had come to terms with the International. All of the cargoes handled by the complainants were in either interstate or foreign commerce, and I believe an understanding or agreement in restraint of this commerce or trade, within the purview of the federal statute, was shown, in which defendants were determined to use force and violence if necessary, although the object of the persons involved primarily was to compel recognition of the International in the manner stated.

As usual in such controversies, I am convinced that perjury was committed by many of the witnesses. The character and type of some of those used by complainants were not such as to inspire confidence, to say the least, while the very circumstances brand as false the statements of numbers of those of the defendants with regard to the presence of arms in the hands of the pickets and members of the defendant locals of the International, especially on the day of the shooting. One of the two deputy sheriffs, who appeared friendly to the defendants, I think unwittingly revealed the true situation just preceding the beginning of the riot. His testimony indicates rather clearly that the appearance of the truck upon its return trip was a signal for those exposed to run for cover, for he admits he had reached and was going behind a filling station when the first shot was fired. In seeking the truth in such matters, courts are justified in using common sense, and do not have to accept unreasonable statements of interested witnesses if they are contrary to human experience. In view of the sniping which had gone on the afternoon before, it is asking too much for the court to believe the occupants of this open truck, granting they were armed, commenced shooting before they had reached the protection of the dock property, or that the guards began shooting at that juncture. The writer visited

the scene at the request of counsel, after the testimony was closed. It would have been next to impossible for any one inside the dock property to have fired the shots which wounded the man on the back of the truck entering the bridge as it was described by the witness Nevels, a member of the defendant International, who admitted he was armed with a pistol; and in view of the testimony of the doctor who examined the wounded man thereafter. Considering the range of the bullet, it seems conclusive that these shots were fired by some one standing near or at the end of the bridge as the truck started upon it, and there were no guards in that vicinity. Several large buildings stood between the dock property and this point. If the wounded man were standing or sitting upon the side of the truck, the middle of his body would be approximately three feet above its floor, and one standing upon the ground, beside the highway, which rises as it approaches the bridge, and firing up at the victim, would, in all human probability, strike him in the manner as was done. It is also remarkable that, if the firing had been started by the guards, they did not station themselves in places for better protection, instead of having their numbers killed and wounded, as above stated, and at the same time for such little damage to have been done to the pickets, if they were exposed as some of the witnesses attempted to describe.

Reverting again to the human probabilities, we have a situation where the defendants and pickets, in view of the feeling and animosity which had been engendered by the bringing in of heavily armed guards, were undoubtedly in a state of mind of violent resentment and, with no respected and impartial state authority in control, such as might have been furnished by the Governor or sheriff, to handle this ugly situation, the defendants undoubtedly decided to take matters into their own hands and force the issue with these imported guards. The net result was that the interest of the public, commerce, and the people whom all the parties were supposed to serve was lost sight of, as is usually the case.

■ I am convinced that the complainants at least encouraged, if they did not actually inspire, the creation of the Louisiana Longshoremen's Associations, as a weapon to combat the International; and that the Lake Charles Maritime Association was not an exclusive or representative organization of the shipping companies, the real employers of longshore labor. Both the employer and employee, as a matter of common justice, as well as by the express terms of the Labor Injunction Act (Norris-La-Guardia Act), 29 U.S.C.A. §§ 101–115, are entitled to pursue and assert their rights, uninfluenced by the other. In no other way can there be fair dealing. The employer naturally wants to have the work done as cheaply and under as favorable conditions to himself as possible, while the employee desires and is entitled to bargain for the highest wages and best working conditions which can be obtained. So long as the exercise of these rights is carried on peaceably and within the law, public sentiment or opinion ordinarily will suffice to hold each side within reasonable bounds; but when, as here, violence, resulting in wounding and killing of human beings, is resorted to, the law, including the Labor Injunction Act itself, notwithstanding its very liberal and favorable provisions towards the employee, requires the court to exercise its lawful powers of restraint.

■ I, therefore, conclude and find, as required by the Labor Injunction Act, as follows:

The property rights of the complainants involved are in excess of the jurisdictional amount of this court.

(a) Unlawful acts have been threatened and committed and will be committed and continued, unless restrained, by the defendants, Locals No. 1214 and No. 1180 of the International Longshoremen's Association, and their members and particularly those named in the bill of complaint; (b) that substantial and irreparable injury to complainants' property will follow; (c) that as to each item of relief granted herein greater injury will be inflicted upon the complainants by the denial of relief than will be inflicted upon defendants by granting it; (d) that complainants have no adequate remedy at law; and, (e) that the public officers of the state, charged with the duty to protect complainants' property, are unable or unwilling to furnish adequate protection.

A preliminary injunction will be granted, but one member of each of the defendant local unions, No. 1214 and No. 1180, of the International Longshoremen's Association, will be permitted to station themselves at the northeast entrance to the dock

property, to peaceably solicit or urge workers entering not to do so, in view of the strike, and also one each of said members may be stationed for the same purpose at the southeast entrance to the port property, all such activities to be under the immediate observation of the officers of this court stationed on the premises.

Proper decree should be presented.